UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CASE NO. 5:16-CV-00009-JA-PRL

EVELYN GRADDY,

        Plaintiff,

vs.

WAL-MART STORES EAST, LP,

        Defendant.

_____/

**DEFENDANT WAL-MART STORES EAST, LP'S MOTION FOR FINAL
SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

Defendant, Wal-Mart Stores East, LP ("Walmart"), pursuant to Federal Rule of Civil Procedure 56, respectfully requests entry of final summary judgment in its favor and against Plaintiff. As discussed below, there are no genuine issues of material fact, and Walmart is entitled to judgment as a matter of law.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**[1]

**I.  Graddy's Employment with Walmart**

    **A.  Graddy's Position and Reporting Structure at Walmart**

Walmart hired Plaintiff Evelyn Graddy in 1988 to work as a part-time staff pharmacist in its stores in Central Florida. Deposition of Evelyn Graddy ("Pl. Dep.") at 35:1-3, 52:2-14, 85:19-21, 92:15-17. In September 2010, Store #800 in Leesburg became Graddy's "home" store, and she "floated" to work at various other locations as needed. Pl. Dep. at 85:22-86:15, 90:18-91:21.

---

[1] For purposes of this motion, this statement of "facts" is taken in large part from Plaintiff's deposition testimony, her Complaint, and documents authored by her or on her behalf. These "facts" are taken as true *only* for purposes of this motion.

As a pharmacist, Graddy worked in Walmart's Health and Wellness (H&W) Division, which is a separate division of the Company that provides pharmacy services within Walmart's retail stores. Pl. Dep. at 102:1-11. In November 2014, Graddy reported to and was supervised by Anthony ("Tony") Nation, who was the H&W Market Director for Graddy's home store. Pl. Dep. at 129:11-18, 130:19-131:2; Deposition of Anthony Nation ("Nation Dep.") at 4:15-5:6. On those occasions when Graddy was working outside of her home store, her direct and immediate supervisor was the H&W Market Director for that particular store. Pl. Dep. at 130:22-131:2.

### B. Walmart's Relevant Policies

Walmart maintains a policy—which is set forth in its Pharmacy Operations Manual ("POM") and designated as POM 1703—that details the steps a pharmacist must follow in handling and reporting a forged or fraudulent prescription. Pl. Dep. 205:20-206:3, Ex. 7. That policy provides that a pharmacist first must examine the prescription closely and, if it appears to be forged or fraudulent, the pharmacist must contact the prescribing practitioner to verify the prescription. Pl. Dep. Ex. 7. Upon being advised by a prescribing practitioner that a prescription is forged or fraudulent, the pharmacist must then request a signed, written statement from the practitioner to that effect. *Id.* Upon receiving that statement, the pharmacist is to then inform the patient that the practitioner has instructed Walmart not to dispense the medication. *Id.* If the practitioner will not provide the statement, then the pharmacist is to inform the patient to check with the practitioner. *Id.* The pharmacist must then report the matter to his or her Market H&W Director. *Id.* After following these procedures, the pharmacist then should contact local law enforcement. *Id.*

Walmart's POM 1703 also specifically addresses what a pharmacist should do if a law enforcement officer requests that the pharmacist fill a forged or altered prescription. *Id.* The policy provides:

> Knowingly dispensing a forged or altered prescription is illegal. ***Any request or direction from law enforcement to fill a forged or altered prescription must be refused.*** Filling a forged or altered prescription even at the direction of law enforcement is not permitted, and law enforcement "sting operations" or similar activities aimed at catching a suspect in the act may threaten the safety of patients and associates. An associate who fills a forged or altered prescription, even at the direction of law enforcement violates company policy and may be subject to disciplinary action up to and including termination.

*Id.* (emphasis added). The POM further instructs pharmacists to contact Regulatory Affairs (at the telephone number provided) if asked by law enforcement to dispense a verified forged or altered prescription. *Id.* Walmart's Professional Accountability Matrix Guidelines provide that a violation of POM 1703 will result in termination. Deposition of Rene Pabon ("Pabon Dep.") at 33:12-14.

Upon her hire and throughout her employment, Graddy was trained on Walmart's policies and procedures. Pl. Dep. at 92:22-93:25. She also was trained on Walmart's Pharmacy Operations Manual, including the section of the POM that addresses forged or fraudulent prescriptions. Pl. Dep. at 98:1-5, 127:4-11. She also was familiar with "the wire," which is an online resource that contains Walmart's policies, procedures, and other information that Walmart associates can access to help them perform their job duties. Pl. Dep. at 98:19-99:1. Whether on the wire or elsewhere, Graddy had access to the POM throughout her employment, and she knew where she could access the POM. Pl. Dep. at 99:2-100:12, 127:12-128:4. She also could ask her supervisors questions about how to perform her job duties if necessary. Pl. Dep. at 100:14-20.

Graddy also was aware that pharmacists are governed by state statute, and she was required to be familiar with what is permissible under Florida law in terms of dispensing medication. Pl. Dep. at 40:2-19. She also received training on Florida law related to pharmacists' legal obligations. Pl. Dep. at 40:20-41:2. She knew that dispensing forged or altered prescriptions is illegal. Pl. Dep. at 234:8-10.

### C. Graddy's Filling of Fraudulent Prescription

On November 20, 2014, Graddy was working in the pharmacy at Walmart Store #1847 in Ocala. Pl. Dep. at 109:22-110:9. Sometime around 2:30 or 3:00 P.M. that day, in accordance with POM 1703, she called the office of Dr. James Rogers to verify a prescription for Xanax that had been called into the pharmacy, reportedly from Dr. Rogers's office. Pl. Dep. at 131:8-15, 134:11-19, 138:16-139:7, Ex. 4. Graddy spoke with Rogers's Office Manager Carey Robinson, who told Graddy that the prescription was fraudulent. Pl. Dep. at 144:22-145:5, 148:11-19. Robinson then immediately called the Ocala Police Department and reported the matter, ultimately speaking with Agent William Christman. Deposition of Carey Robinson ("Robinson Dep.") at 14:15-22, 17:20-18:15. During their conversation, Christman told Robinson that they could not do anything unless someone actually showed up to pick up the prescription. Robinson Dep. at 18:24-19:6. Robinson then called Graddy back and told her to fill the prescription so the police could arrest the perpetrator. Robinson Dep. at 19:7-10, 19:16-18, 21:10-15. At some point, Graddy placed the prescription in "trouble" status, which meant that it could not be filled. Pl. Dep. at 143:25-144:2, 144:18-21. Graddy later instructed the pharmacy cashier, Sarah Page, to go ahead and bag the prescription and place it by her (Graddy's) computer, which Page did. Deposition of Sarah Page ("Page Dep.") at 13:7-10, 19:18-20:2.

Shortly after speaking with Robinson, Christman went to Store #1847 along with an agent from the Marion County Sheriff's Office. Christman Dep. at 17:1-15, 19:19-22; Pl. Dep. at 154:16-155:2. Graddy was at lunch at the time Christman arrived but, when she returned, Christman introduced himself and told her that he would like Walmart to sell the prescription to the perpetrator, and that he would then arrest her. Christman Dep. at 21:5-16, 22:12-20, 27:13-20, 50:17-22, 67:10-17. Christman asked for Graddy's cooperation but did not give her any specific instruction. Pl. Dep. at 158:9-15. Graddy complied with Christman's request. Christman Dep. at 22:8-11, 23:4-7; Pl. Dep. at 169:19-21.

Christman testified at deposition that, if Graddy had refused to fill the fraudulent prescription, he simply would have asked her—as he had done in other cases—to facilitate the arrest by questioning the perpetrator to verify the information on the prescription when she arrived to pick it up. Christman Dep. at 27:22-29:16, 30:4-9. Christman did not tell Graddy that she would be violating the law if she refused his request. Christman Dep. at 57:3-7; Pl. Dep. at 169:19-170:1, 170:10-17. Nor did he threaten her with arrest or prosecution, or indicate that there would be any negative consequences if she did not comply. Pl. Dep. at 177:19-178:11. Christman is familiar with Florida's obstruction-of-justice statute, Florida Statutes section 843.06. Christman Dep. at 23:20-24:17. On those occasions in which pharmacists have refused to fill a fraudulent prescription at his request, Christman has never pursued or recommended charges against them for violating section 843.06. Christman Dep. at 26:3-11.

Christman and the other agent waited in the store for several hours for the perpetrator to show up to pick up the prescription. Christman Dep. at 67:3-9. She finally arrived in the pharmacy around 8:30 or 8:40 that night, shortly before the pharmacy was scheduled to close.

5

Christman Dep. at 32:12-33:14. After purchasing the prescription, the perpetrator exited the store and was immediately arrested. Christman Dep. at 37:15-38:25.

Graddy acknowledges that she did not personally call H&W Regulatory Affairs concerning the fraudulent prescription, but she believes Pharmacy Manager Ashley Berry did so while Graddy was at lunch because Graddy heard Berry and Elias, another pharmacist who was working in the Ocala store that day, say that "they were calling them."[2] Pl. Dep. at 128:7-10, 149:15-150:24, 150:25-151:3, 154:3-6, 173:8-22; Deposition of Ashley Berry ("Berry Dep.") at 4:15-18, 5:3-11. She further testified that she did not call because she "was in the middle of taking care of everything and taking care of prescriptions and taking care of people." Pl. Dep. at 151:17-23. After discovering that the prescription was fraudulent, Graddy never called any member of management—either inside or outside Walmart's H&W Division—to report the situation "[b]ecause the pharmacy manager was there and she's next in command and so [Graddy] didn't feel like [she] had to."[3] Pl. Dep. at 152:12-24.

### D. Walmart's Investigation and Graddy's Termination

On November 21, 2014, Berry called and reported the matter to her boss, Market H&W Director Guy Peshek. Berry Dep. at 16:21-17:9, 17:20-18:2, 26:15-27:11; Deposition of Guy Peshek ("Peshek Dep.") at 4:18-5:13, 10:10-23. Berry also obtained statements from the associates under her supervision—which did not include Graddy—who were working in the

---

[2] Page testified that she heard Elias say that he did not want to have anything to do with filling the fraudulent prescription, and that it was Graddy's decision. Page Dep. at 20:9-21:2. Pharmacy Technician Katie Vardis similarly testified that she heard Elias tell Graddy that he would not fill a fraudulent prescription. Deposition of Katie Vardis ("Vardis Dep.") at 20:6-11. Vardis also testified that, if a police officer asked her to fill a forged or fraudulent prescription, she would not have done so because it is "basic knowledge" that you do not fill a prescription that you know is fraudulent. Vardis Dep. at 22:10-18.

[3] Although Berry testified in her deposition that she was not present in the store on November 20, 2014, Graddy's allegations are taken as true for purposes of this motion only.

pharmacy on the day of the incident, and she summarized their statements in an email to Peshek. Berry Dep. at 17:20-18:10, 27:25-28:9, Ex. 1. Peshek also obtained a statement (email) from Graddy regarding the incident. Pl. Dep. at 186:22-187:18, 188:12-14, Ex. 5. In her statement, Graddy provided a great deal of detail about her phone calls with Dr. Rogers's office, but she essentially glossed over her interactions with Christman, stating only that he had "said they had to watch [the perpetrator] buy and walk out [the] door because she was also shop lifting and [Asset Protection] wanted to catch her. And so I complied."[4] Pl. Dep. Ex. 5. Graddy made no effort to explain her failure to comply with POM 1703, nor did she mention anything about Berry's alleged involvement. *Id.*

Peshek discussed the matter with his boss, Regional H&W Director Rene Pabon, who then consulted with Senior HR Manager Jamey Miller. Pabon Dep. at 5:13-16, 6:6-8, 21:22-22:12; Deposition of Jamey Miller ("Miller Dep.") at 3:21-4:6; Peshek Dep. at 9:15-10:1, 12:13-17. After they reviewed the matter including the written statements, Peshek recommended, and Pabon and Miller agreed, that Graddy should be discharged in accordance with the accountability matrix for violating POM 1703. Pabon Dep. at 20:5-21:19, 22:22-23:2, 29:16-30:4, 31:7-16; Miller Dep. at 34:12-20; Peshek Dep. at 15:6-11, 16:11-16, 26:21-23, 40:6-23, 42:13-18.

---

[4] Graddy now contends that an unidentified Asset Protection Associate (APA) was present when Christman asked her to fill and sell the prescription, and therefore she thought she was "supposed to follow the Wal-Mart employee." Pl. Dep. at 155:7-24, 156:14-16, 226:24-227:12. As noted above, however, the written statement that she prepared shortly after the incident evidences that Asset Protection was involved because the perpetrator also was shoplifting in the store. Pl. Dep. Ex. 5. As Asset Protection Manager David Reeve explained in his deposition, Asset Protection personnel are chiefly responsible for handling theft issues; they are not trained on pharmacy policies and procedures, and they have no jurisdiction over the pharmacy and would not be in a position to advise pharmacy personnel with respect to participating in a police sting operation. Deposition of David Reeve at 9:6-10:5, 16:12-17:10, 50:24-51:12, 51:22-52:8. Moreover, Graddy testified that she did not ask the APA who was present that night what she should do, nor did he tell her what to do. Pl. Dep. at 236:2-10.

7

Pabon and Peshek then conveyed the termination decision and the reason for the decision to Graddy's supervisor, Tony Nation, and instructed Nation to carry out the decision. Peshek Dep. at 21:4-15, 23:9-24, 42:22-43:4; Nation Dep. at 6:23-7:1, 9:7-12, 22:24-23:6, 24:11-21. Accordingly, Nation prepared an exit interview form, on which he inadvertently indicated that Graddy was being terminated for violating POM 903, rather than POM 1703. Nation Dep. at 13:7-14:3. Nation met with Graddy on the next day that she was scheduled to work at Walmart in January 2015. Nation Dep. at 25:5-10; Pl. Dep. at 212:18-20. During that meeting, Nation advised Graddy that she was being terminated because she had violated Walmart policy by knowingly filling a fraudulent prescription; Graddy responded that she disagreed with the decision because she had acted at the direction of law enforcement. Nation Dep. at 29:24-30:25; Pl. Dep. at 194:5-195:4.

## II.    Graddy's Allegations

Graddy's Amended Complaint asserts a single claim against Walmart for violation of Florida's Whistleblower Act, Florida Statutes section 448.102 ("FWA"). To support her claim, Graddy alleges that she objected to the termination decision and Walmart's "policy of non-cooperation with law enforcement," which she contends violates Florida Statutes section 843.06. Am. Compl. ¶ 17. She further alleges that Walmart terminated her employment in retaliation for those objections. Am. Compl. ¶ 18.

Graddy testified that she "blew the whistle" on Walmart by cooperating with law enforcement on November 20, 2014. Pl. Dep. at 198:5-10, 200:12-15, 203:13-15. She believes the activity that provided her with protection from retaliation occurred when she told Nation that she should not be terminated as a result of her cooperation with law enforcement on November 20th. Pl. Dep. at 203:16-23. She acknowledges, however, that Walmart's policy

8

reflects that the Company is not against making appropriate referrals to law enforcement; to the contrary, it encourages appropriate involvement by law enforcement. Pl. Dep. at 207:11-21.

## ARGUMENT

I.     **SUMMARY JUDGMENT STANDARD**

The U.S. Supreme Court has unequivocally endorsed the right of a trial judge to grant summary judgment. *Celotex v. Catrett*, 477 U.S. 317 (1986). Rejecting limits on the granting of summary judgment, the Court held that summary judgment is not a "disfavored procedural shortcut," but is an important part of the Federal Rules of Civil Procedure. *Id.* at 327. If, after adequate time for discovery, a party who is confronted with a properly supported motion for summary judgment "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial," the plain language of Federal Rule of Procedure 56 mandates entry of summary judgment. *Id.* at 322; *Earley v. Champion Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

To avoid summary judgment, the non-moving party must come forward with specific *facts*, not mere allegations, which show there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir. 1987). A non-moving party must present sufficient evidence to create a genuine issue of material fact regarding each element of the *prima facie* case. *Harris v. H&W Contracting Co.*, 102 F.3d 516, 523 (11th Cir. 1996). These facts cannot be established by naked belief, speculation, or unsupported conclusory allegations of wrongdoing. *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995). Under this standard, Graddy cannot sustain her claim, and Walmart is entitled to judgment as a matter of law.

9

## II.     GRADDY'S CLAIM FAILS AS A MATTER OF LAW.

### A.     Burden of Proof

Graddy must establish her claim through the familiar three-step burden-shifting framework applied in Title VII cases. *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000). Under this framework, if Graddy can establish a *prima facie* case, the burden will shift to Walmart to present evidence that it had a legitimate, non-discriminatory reason for the challenged employment action. *Castillo v. Roche Labs, Inc.*, 467 F. App'x 859, 862-63 (11th Cir. 2012). Once it does so, the burden will shift back to Graddy to prove that Walmart's proffered reason is pretextual, and that the real reason was retaliation. *Id.* at 863. As discussed below, based on the undisputed facts, Graddy cannot prove unlawful retaliation.

### B.     Graddy Cannot Establish a *Prima Facie* Claim of Retaliation.

Florida Statutes section 448.102(3) provides that it is unlawful for an employer to retaliate against an employee because the employee has "[o]bjected to, or refused to participate in, any activity, policy, or practice of the employer that is in violation of a law, rule, or regulation." Section 448.103(c) provides that "[a]n employee may not recover in any action brought under [the act] . . . if the retaliatory personnel action was predicated upon a ground other than the employee's exercise of a right protected by this act."

To establish a *prima facie* case under the statute, Graddy must prove that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) the adverse employment action was causally linked to the protected activity. *White v. Purdue Pharma, Inc.*, 369 F. Supp. 2d 1335, 1336 (M.D. Fla. 2005).

### 1. Graddy Cannot Establish That She Engaged in Statutorily Protected Activity.

Graddy cannot establish the first prong of the *prima facie* case: that she engaged in statutorily protected activity. In *White*, the court considered the burden of proof required to establish a claim under the FWA. In so doing, the court first examined the statutory language:

> [T]he plain language of Fla. Stat. § 448.102(3) states that a Plaintiff, in order to prevail under a Florida Whistle-Blower action for objecting or refusing to participate in an activity, policy or practice of the employer, must prove that the activity, policy or practice objected to *is*, in fact, in violation of a law, rule or regulation. As the provided emphasis on the word "is" makes clear, no qualification was provided to permit shelter for the employee who reasonably believes she is being asked to engage in illegal activity. Had the legislature intended such protection, the legislature could have included such language in the statute as it has shown itself capable in the past. For example, the legislature included in Florida's public Whistle-Blower Act language that an agency or independent contractor may not take adverse personnel action against an employee for disclosing information regarding "any violation *or suspected violation* of any federal, state or local law, rule, or regulation." See Fla. Stat. § 112.3187 (emphasis added).

*White*, 369 F. Supp. 2d at 1337.

Based on the statutory language as well as cases in which the Florida state courts had implicitly found that a suspected violation of law was insufficient, the court concluded that a plaintiff "will have to prove as part of her *prima facie* case that she objected to or refused to participate in an activity, policy, or practice of Defendant which was, *in fact*, in violation of a law, rule, or regulation or which would have constituted a violation of a law, rule or regulation had Plaintiff participated." *Id.* at 1339 (emphasis added); *see also Kearns v. v. Farmer Acquisition Co.*, Case No. 2D12-6388, 2015 Fla. App. LEXIS 1782, 157 So. 3d 458, 465 (Fla. 2d DCA 2015) (table decision) ("Based on a plain reading of the FWA and the reasoning in *White*, we agree with the Employer that under section 448.102(3) [plaintiff] must prove that he objected to an actual

11

violation of law or that he refused to participate in activity that would have been an actual violation of law.").

In *Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 916 (Fla. 4th DCA 2013), the court concluded without analysis that, to state a claim under the FWA, an employee need only have "a good faith objectively reasonable belief" that her activity was statutorily protected. The Florida Supreme Court has not resolved the apparent split between *Kearns* and *Aery*. Moreover, prior to *Aery* and *Kearns*, "all three federal district courts sitting in Florida ha[d] held that the plaintiff must prove an actual violation of law." *In re Standard Jury Instructions in Civil Cases–Report No. 2011-01 (Unlawful Retaliation)*, 95 So. 3d 106, 110 (Fla. 2012) (citing cases); *see also Hamm v. Johnson Bros., Inc.*, Case No. 6:06-cv-1348-Orl-28KRS, 2008 U.S. Dist. LEXIS 54624, at *17 n.1 (M.D. Fla. July 17, 2008) (citing *White* and noting that a plaintiff is required to show an actual violation of law). This Court should continue to follow the well-reasoned decision in *White*, as adopted in *Kearns*, and reject the "good-faith" standard that is contrary to plain language of the FWA.

Even were the Court to adopt the lower "good-faith" standard, Graddy's claim still would fail. As discussed above, Walmart's policy does not require its pharmacists to violate the law, and it is not objectively reasonable to believe that it does. To the contrary, the policy is fully consistent with the law, including the Florida Comprehensive Drug Abuse Prevention and Control Action, Florida Statutes chapter 893, and the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, which prohibit the filling of a fraudulent prescription. Those statutes do not provide any exceptions, nor do they expressly permit a pharmacist to fill a fraudulent prescription at the direction of a law enforcement officer. *See generally United States v. Norris*, 780 F.2d 1207, 1209 (5th Cir. 1986) (stating *prima facie* elements of violation of Controlled Substances

Act are: (1) distributing or dispensing a controlled substance; (2) knowingly and intentionally; and (3) for other than a legitimate medical purpose and in the usual course of his or her professional practice); *United States v. Kershman*, 555 F.2d 198 (8th Cir. 1977) (affirming conviction of pharmacist for knowingly and intentionally distributing controlled substances where there was no reason to believe there were prescriptions issued for a legitimate medical purpose by a physician during the usual course of his professional practice).

Walmart anticipates that Graddy will argue that Florida Statutes section 893.13(9)(h) makes it legal for a pharmacist to dispense a forged prescription to a criminal suspect if the pharmacist does so at the direction of law enforcement. That contention is wrong. That statute provides that the provisions of Florida Statutes sections 893.13(1) through (8), which prohibit certain sales, deliveries, and possession of controlled substances, "are not applicable to the delivery to, or actual or constructive possession *for medical or scientific use or purpose only* of controlled substances by persons in any of the following classes, or the agents or employee of such persons . . . : (h) Law enforcement officers for bona fide law enforcement purposes in the course of an active criminal investigation." FLA. STAT. § 893.13(9)(h) (emphasis added). This provision does not apply because Graddy did not dispense the prescription for a "medical or scientific use or purpose," nor did she deliver the prescription to a law enforcement officer or his agent. Thus, the provision did not provide a "safe harbor" permitting Graddy to dispense the fraudulent prescription.

Graddy alleges in her Amended Complaint that, had she not cooperated with Agent Christman by dispensing the medication, she would have violated Florida Statutes section 843.06. This statute provides in relevant part as follows:

13

> Whoever, being required in the name of the state by any . . . police officer . . . , neglects or refuses to assist him or her in the execution of his or her office in a criminal case, . . . shall be guilty of a misdemeanor . . . .

FLA. STAT. § 843.06.

As noted above, Agent Christman did not require Graddy to assist him by dispensing medication under the fraudulent prescription; rather, he merely requested that she do so. Christman testified in his deposition that, if Graddy had refused his request to fill the fraudulent prescription, he simply would have asked her to facilitate the arrest by questioning the suspect to verify the information on the prescription when she showed up to pick up the medication. He further testified that, on those occasions in which pharmacists have refused to fill a fraudulent prescription at his request, he has never pursued or recommended charges against them for violating section 843.06. Indeed, if Graddy had advised Christman that she needed to consult with a supervisor before filling the fraudulent prescription, he would not have had probable cause to arrest her under section 843.06. *See Depalis-Lachaud v. Noel*, 505 F. App'x 864, 868-89 (11th Cir. 2013) (finding that police officer lacked probable cause to arrest nurse who alleged that she had responded to officer's request that she draw blood from a suspect by "seeking authorization from the appropriate superiors, as she believed the hospital's policies required").

Had Graddy followed Walmart's policy and contacted the appropriate persons to discuss the matter at any time during the several hours that the officers were waiting in the store for the perpetrator to show up, a suitable solution could have been reached that would not have run afoul of Walmart's policy. Instead, apparently caught up in the thrill of being involved in the apprehension of a criminal, Graddy blatantly violated Walmart's policy by wholly disregarding the policy's reporting requirements and filling a prescription that she knew was fraudulent.

Moreover, to the extent Graddy claims that she was discharged because she "refused to participate" in a policy that was—or that she reasonably believed was—unlawful, her claim also necessarily fails. First, and foremost, she did not "refuse to participate" in the policy; rather, she failed to comply with it. As the Virginia Supreme Court explained, "refusal" and "failure" are two very different things:

> The verb "refuse" is defined as a "positive unwillingness to do or comply with" something demanded or expected. Webster's Third New International Dictionary 1910 (1993). A "refusal" is "[t]he denial or rejection of something offered or demanded." Black's Law Dictionary 1285 (7th ed.1999). These definitions denote an element of intent, manifested by a volitional act. *See Meeks v. Stevens*, 301 Ark. 464, 785 S.W.2d 18, 20 (1990) (noting that definitions of term "'refuse' stress the active element of refusal[,] . . . expressing. . . a determination not to do a particular thing"); *Nebraska v. Medina*, 227 Neb. 736, 419 N.W.2d 864, 867 (1988) ("'To refuse]'. . . requires that a person understand what is being asked of him and then in some way manifest nonacceptance, nonconsent, or unwillingness.").
>
> By comparison, to "fail" to do some act denotes a deficiency; and a "failure" is "[a]n omission of an expected action . . . or performance[,]" Black's Law Dictionary 613, or the neglect of an assigned or expected action, Webster's Third New International Dictionary 815. *See Laubach v. Franklin Square Hosp.*, 79 Md.App. 203, 556 A.2d 682, 690 n. 11 (1989), *aff'd*, 318 Md. 615, 569 A.2d 693 (1990) (distinguishing "[f]ailed" from "refused" on basis that "refused" "involves an act of the will," while "[f]ailed" may be "an act of inevitable necessity") (quoting Black's Law Dictionary 1152-53 (5th ed.1979)).
>
> Based on the distinction between the terms "refuse" and "fail," we conclude that State Farm's attempt to equate the insureds' failure to timely comply with the requirements of paragraph 1 with a refusal to do so does not comport with the ordinary and customary meaning of the term "refuse."

*Craig v. Dye*, 526 S.E.2d 9, 12 (Va. 2000).

Here, Graddy did not tell any Walmart manager or any of the decision-makers that she would not comply with Walmart's policy because she believed it was unlawful. Rather, she simply complied with the first part of the policy—by contacting Dr. Rogers's office to verify the

prescription—but then she failed to perform (or disregarded) the remainder of the policy's requirements. Thus, she did not "refuse to participate" in the policy.

Second, Graddy failed to comply with Walmart's policy in two ways: by disregarding the policy's reporting requirements, and by filling a prescription that she knew to be fraudulent. Graddy now claims that she failed to comply with the reporting requirements because she believed Pharmacy Manager Berry was doing so. Even accepting this allegation as true, however, it does not constitute a "refusal" to participate in the reporting requirement, rather than a failure to do so. Moreover, the policy directs the pharmacist to follow certain delineated steps in handling and reporting fraudulent prescriptions; it does not allow a pharmacist to delegate her obligations under the policy to anyone else.

Because Graddy cannot show that she objected to or refused to participate in an actual or suspected violation of law, she did not engage in statutorily protected activity.

### 2. Graddy Cannot Show That She Was Discharged Because She Engaged in Any Alleged Protected Activity.

Even if Graddy had engaged in statutorily protected activity (which she did not), her claim necessarily fails because she cannot show that she was discharged because of that alleged activity. Contrary to her allegations, Graddy was not discharged for cooperating with law enforcement, nor did anyone ever tell her not to cooperate with law enforcement.

Graddy testified in her deposition that she "objected" to Walmart's policy upon being told that she was being discharged for violating the policy. In other words, she claims to have engaged in statutorily protected activity *after* the termination decision had been made and conveyed to her. It is axiomatic that an adverse employment action that precedes statutorily protected conduct cannot form the basis for a claim of retaliation. *See, e.g., Griffin v. GTE Fla.,*

*Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999) ("At a minimum, [the plaintiff] must show that the adverse act followed the protected conduct; this minimum proof stems from the important requirement that the employer was actually aware of the protected expression at the time it took adverse employment action.") (internal quotation marks omitted).  Thus, Graddy cannot show that she was discharged because she had engaged in statutorily protected conduct.

### C. Walmart's Legitimate Reasons for Its Actions Defeat Graddy's Claims.

Even if Graddy could establish a *prima facie* case of discrimination or retaliation (and she cannot), Walmart can rebut the inference of discrimination by articulating a legitimate, non-discriminatory reason for terminating Graddy's employment.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  Because a defendant need only produce, not prove, a non-discriminatory reason, this burden is "exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).  The undisputed record evidence in this case shows that Graddy was discharged for a legitimate non-retaliatory reason.  As discussed above, Walmart terminated Graddy's employment solely because she violated POM 1703, which violations included filling a prescription that she knew to be fraudulent and failing to report the matter to the appropriate persons.

Graddy cannot show that Walmart's proffered reason for the termination decision is pretextual.  As the Eleventh Circuit has explained, "if the [employer's] proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004).  To do so, she "must come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by [Walmart] were not the real reasons for the adverse employment decision." *Hamm*, 2008 U.S. Dist. LEXIS 54624, at *11-12 (internal quotation

marks omitted). To meet this burden, she must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Walmart's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* at *12 (internal quotation marks omitted). Graddy cannot show pretext, as there is no evidence whatsoever that Walmart's proffered reason for the termination decision is false and that the real reason was intentional retaliation. As such, Graddy will be unable to sustain her claim.

It is well-settled that it is not Graddy's or the Court's role to second-guess Walmart's personnel decisions. *See, e.g.*, *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991). Courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead, [their] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). Thus, Graddy cannot base her claim on the simple fact that she may not have agreed with Walmart's business decision, and her disagreement with that decision does not render Walmart's stated explanation unworthy of credence or otherwise raise a genuine issue of fact. *See Cooper v. Southern Co.*, 390 F.3d 695, 738 (11th Cir. 2004); *see also Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and to be blunt about it, not on reality as it exists outside of the decision maker's head."). Rather, to sustain her claim, Graddy must present "significant probative evidence of pretext." *Castillo*, 467 F. App'x at 863. "Conclusory allegations of . . . retaliation, without more, are insufficient to carry the plaintiff's burden." *Id.*

Walmart anticipates that Graddy will argue that Walmart's proffered reason for the termination decision is pretextual because the exit interview form erroneously cited the wrong provision of Walmart's POM. As discussed above, however, Tony Nation testified that his

18

citation to POM 903 rather than POM 1703 was inadvertent. And, in any event, it is undisputed that Nation explicitly told Graddy that she was being discharged for violating Walmart policy by filling a prescription that she knew was fraudulent. Because Graddy can present no evidence contradicting the validity of Walmart's rationale for the termination decision, she cannot establish pretext and cannot survive summary judgment. *See, e.g.*, *Castillo*, 467 F. App'x at 864 (affirming summary judgment for employer based in part on fact that plaintiff "failed to present sufficient evidence that [defendant's] proffered reason for his termination was pretextual").

## CONCLUSION

Even construing the evidence in the light most favorable to Graddy, her claim must fail because there are no genuine issues of material fact and Walmart is entitled to judgment as a matter of law. Accordingly, Walmart respectfully requests entry of summary final judgment in its favor and against Graddy.

Respectfully submitted,

*s/Jonathan A. Beckerman*
Jonathan A. Beckerman
Florida Bar No. 568252
LITTLER MENDELSON, P.C.
*Counsel for Defendant*
333 S.E. 2nd Avenue, Suite 2700
Miami, Florida 33131-2187
Telephone: (305) 400-7500
Facsimile: (305) 603-2552
E-mail: jabeckerman@littler.com

## CERTIFICATE OF SERVICE

I hereby certify that, on the 1st day of November, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: None.

*s/ Jonathan A. Beckerman*
Jonathan A. Beckerman

Firmwide:143343723.1 080000.1141